1   BRIAN J. STRETCH (CABN 163973)
United States Attorney

2

BARBARA J. VALLIERE (DCBN 439353)
3   Chief, Criminal Division

4   DAMALI A. TAYLOR (CABN 262489)
WILLIAM FRENTZEN (LABN 24421)
5   Assistant United States Attorney

6       450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
7       Telephone: (415) 436-6401
FAX: (415) 436-6753
8       damali.taylor@usdoj.gov; william.frentzen@usdoj.gov

9   Attorneys for United States of America

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

UNITED STATES OF AMERICA,          )   CR 16-71663
14                                         )
            Plaintiff,              )   MEMORANDUM BY THE UNITED STATES IN
15                                         )   FURTHER SUPPORT OF THE DETENTION OF
      v.                           )   MARCUS ETIENNE
16                                         )
MARCUS ETIENNE,                    )   Hearing date: February 1, 2017
17                                         )
            Defendant.             )
18   _____ )

19                      **INTRODUCTION**

20          This is no ordinary marijuana conspiracy case.  As the Complaint describes, it is a multi-district

21   marijuana conspiracy that resulted in the murders of two of the defendant's co-conspirators.  The

22   evidence—some of which was shared with the Court during the defendant's detention hearing—

23   implicates the defendant in these homicides.  Not only is the defendant facing a five-year mandatory

24   minimum sentence in this case, he is also aware that he is under investigation for those homicides.  In

25   short, he has strong incentive to flee and the financial means to accomplish it.  As if that were not

26   sufficient, the defendant has a long history of violating court orders.  Given the facts and circumstances

27   of this case—as further described below—it is no surprise that Pretrial Services Offices in two different

28   districts have recommended that the defendant be detained.

                                    1

1       There is ample reason for the Court to find that, by clear and convincing evidence, no condition

2  or combination of conditions in 18 U.S.C. § 3142(c) will reasonably assure the safety of any other

3  person and the community.  *See* 18 U.S.C. §§ 3142(e) and (f); *United States v. Motamedi*, 767 F.2d

4  1403, 1406 (9th Cir. 1985).  The Court should also find by a preponderance of the evidence that no

5  condition or combination of conditions will reasonably assure the defendant's presence in court.  *Id*.

6

7                         **ARGUMENT**

8  **The Defendant Poses an Incredible Risk of Flight**.

9       The defendant has a criminal history that is replete with failures to appear.  In reviewing his

10  criminal history, undersigned counsel counted *nine* separate failures to appear/bench warrants/fugitive

11  warrants.  As if that were not bad enough, he also has a conviction for committing a battery on a police

12  officer.  *See* Exhibit A.  His conviction history also includes multiple violations of probation, as well as

13  felony convictions for possession with intent to distribute cocaine.  Some of these convictions overlap.

14  Moreover, the defendant has ready access to huge amounts of capital and he has strong incentive to flee.

15  A review of a drug ledger, located at the found during a May 2016 search executed at the defendant's

16  home—and confirmed by his co-defendant as a drug ledger of money owed to the defendant—shows

17  that multiple individuals owe and/or have already paid the defendant tens of thousands of dollars in

18  connection with this marijuana conspiracy, furthering the defendant's access to funds which could aid in

19  his flight. A review of defendant's flight records also shows consistent travel throughout the United

20  States.  The defendant has not and cannot explain how a halfway house environment—an environment

21  everyone agrees he can simply walk away from—could mitigate this risk.

22

23  **The Defendant is a Danger to the Community.**

24       In addition to the defendant's history of flouting court orders, this Court should be concerned by

25  the fact that the defendant is under investigation for two different homicides—murders of his co-

26  conspirators in the very conspiracy charged in this case.  With respect to the March 2016 murder of his

27  co-conspirator Thibodeaux in Oakland, CA, flight records indicate that the defendant flew to the bay

28  area with Thibodeaux and flew back right before the murder.  This is consistent with the statement that

soon-to-be murder victim Rodney Savoy gave to law enforcement after Thibodeaux's murder. Savoy made clear to law enforcement that he believed this defendant was responsible for Thibodeaux's murder—not as the shooter, but the one who directed it.[1] Savoy described uncharged co-defendant Mario Robinson as one of the defendant's enforcers. Savoy himself was murdered 5 months later in the area of defendant's hometown near Opelousas, Louisiana. When law enforcement questioned the defendant about Savoy's homicide at the time of his arrest, the defendant admitted that Savoy owed the defendant money when he was killed. The murder weapon has not been found concerning either homicide.

In the weeks before he was arrested in this case and had evidence destroyed (as discussed below), the defendant was arrested for threatening to kill his sister-in-law. He told her "that he was going to kill her, and put a bullet through her head." *See* Exhibit B. She was clear that she did not feel safe and was afraid of what the defendant would do to her. *Id*. This is the same sister-in-law whose home the defendant ordered another co-conspirator (Craig Marshall) to burglarize just last month.

**The Defendant Has <u>Already</u> Obstructed Justice.**

On December 14, 2016—the day after he was arrested in the instant case, the defendant placed multiple phone calls trying to reach Craig Marshall to get him to conceal evidence. Marshall is an uncharged co-conspirator in the charged marijuana conspiracy. The defendant's phone calls to Marshall—made from a Louisiana jail—were recorded. In these calls, the defendant and Marshall (as well as another unknown male) discussed the search that law enforcement conducted at the time of the defendant's arrest, which occurred in Carencro, LA. Marshall told the defendant that he and the defendant's other cronies had been driving back and forth watching as law enforcement executed the warrant in Carencro, LA, which is the residence that Etienne was observed leaving prior to his arrest. The two discussed the fact law enforcement didn't find anything during the search. Law enforcement did not locate evidence concerning the aforementioned murders during the search warrant at the

---

[1] The investigation into those murders is ongoing. As a result, undersigned counsel simply cannot disclose all of the information we have concerning these murders without jeopardizing the investigation, potential evidence and potential witnesses. Nor should the government have to, given the record before the Court and this defendant's history. There is more than enough to support his detention.

Carencro, LA residence.

Very quickly into their conversation, the defendant instructed Marshall to break into his mother-in-law's home to retrieve a Nike shoe box from the residence. In a later call, the defendant confirmed that Marshall and/or other individual(s) went to get "the stuff." Not surprisingly, the defendant's mother-in-law and sister-in-law later spoke with the Sheriff's Office and reported that there was a break-in at the residence. When police arrived, they observed that someone had used a tool to pry open a window; the window screen was on the floor. The defendant's mother-in-law provided police with consent to search the residence. The defendant's sister-in-law told police that she had observed a vehicle "continuously passing in front of the residence…at a very slow pace and routinely stop." *See* Exhibit B, filed under seal herewith. She "assumed that the occupants of the vehicle are the individuals responsible for breaking into the residence." *Id*. She also noted that the home had never been burglarized before. In sum, the home was burglarized on the very evening that the defendant directed a co-conspirator(s) to go there to retrieve a shoebox. Nothing was reported stolen from the residence, however, if a shoebox that Etienne described had been there, it was gone when law enforcement searched the house after the burglary.

**A Halfway House Does Nothing to Mitigate these Risk**s.

The government is troubled by the Court's inclination to place the defendant in a halfway house. There is nothing whatsoever preventing a defendant from simply walking out of a halfway house. There are no locks on the doors, and no armed guards. In *Fulgham,* Judge Westmore recognized the well-known, irrefutable fact in denying a similar motion. 2012 WL 2792439, at *5 ("Defendant suggested that he live in a halfway house, but that is not a viable option because he could walk away from a halfway house at any time."). During the detention hearing, the Court remarked that it is possible for the defendant to order a homicide from jail. However, as the Court is aware, jail calls are recorded and monitored. Ordering a homicide on a jail call would make Etienne both incredibly stupid and incredibly brazen. By contrast, calls made from a halfway house are free from scrutiny. Placing defendant Etienne, a.k.a., "Hitler" in an unfettered halfway house environment would be a boon for him. The government's fears are neither speculative nor unwarranted. This man is being investigated for two

1   homicides.  The government does not believe that he is finished.

2        All of the following remains unchanged: 1) Pretrial Services in two districts recommended that

3   the defendant be detained; 2) The defendant has numerous bench warrants for failure to appear; 3) the

4   defendant was convicted for battery on a police officer; 4) the defendant knows that he is being

5   investigated for murdering his co-conspirators (crimes for which he would face life); 5) the defendant is

6   currently facing a mandatory minimum imprisonment of five years; 6) the defendant has already

7   directed a co-conspirator(s) to destroy evidence from county jail, thereby obstructing justice; and 7) the

8   defendant is free to simply walk away from a halfway house.  It is inconceivable how releasing

9   defendant Etienne to a halfway house could mitigate the risks he poses and no one has even tried to

10   establish how a halfway house could possibly hold him.

**CONCLUSION**

        For all of the above reasons, the government respectfully requests that defendant Etienne be

detained for the safety of the community and because he is a demonstrated risk of flight.

Dated: January 29, 2017           Respectfully submitted,

                                     BRIAN J. STRETCH
                                     UNITED STATES ATTORNEY

                   By:       /s/
                                     Damali Taylor
                                     Assistant United States Attorney